## FERGUSON and others *v.* DENT and others.

*(Circuit Court, W. D. Tennessee.    July 17, 1885.)*

1. EQUITY—PRINCIPAL AND AGENT, DEALINGS BETWEEN—INADEQUACY OF PRICE
   —UNDUE INFLUENCE.
   Where the relation of principal and agent existed between the parties to a
   contract for the sale of land, and it appeared that the price paid was grossly
   inadequate, a court of equity conclusively presumes undue influence and im-
   position, and will set aside a sale by the principal to the agent ; but there were
   other circumstances abundantly proving the undue influence and imposition,
   in this particular case.    And, in determining the question of inadequacy, the
   fact that the debts agreed to be paid, as part of the consideration, were settled
   for comparatively small sums, were paid almost wholly out of the property con-
   veyed, and that no security for the debts or consideration to be paid the princi-
   pal was given by the agent, demonstrates the inadequacy, and some undue in-
   fluence and imposition, particularly when the largest part of the debts were
   those of the agent himself, for which the principal was only his surety.

2. SAME SUBJECT—ACQUIESCENCE—STALE DEMAND.
   Where the agent went into possession under a fraudulent purchase from the
   principal, with whom he had an understanding that secrecy was to be observed,
   in aid of their purpose to defraud the creditors, and the contract was withheld
   from registration, and all the books and papers were kept by the agent, *held*,
   that there were no laches on the part of the principal or his heirs in bringing
   suit under the facts of this case.

3. IMMORAL CONTRACT—DIVISION OF FRAUDULENT PROFITS.
   If two enter into a scheme to defraud their creditors, by concealing the
   property of one of them by various contrivances, and afterwards the owner of
   the property sells his interest to the other, on condition that he shall be paid a
   certain sum, and protected from the debts, the fraudulent character of the
   transaction will not avail the vendee as a defense against a bill to set aside the
   contract, as unconscionable, for inadequacy of price, and fraudulent imposi-
   tion by undue influence.

4. BANKRUPTCY—ESTOPPEL BY OATH.
   Where a bankrupt swore on his schedules that he owned no real estate at the
   time of filing the petition, neither he nor his heirs are estopped by that oath
   from asserting their claim to property fraudulently procured by his vendee.

5. SAME SUBJECT—FRAUDULENT PURCHASE FROM A BANKRUPT—EFFECT OF BANK-
   RUPTCY—RIGHT TO FILE BILL.
   The heirs at law of a bankrupt may file a bill to recover property fraudu-
   lently procured from him, and their recovery will inure to the assignee.    But,
   in this case, the debts having been all settled, with insignificant exceptions,
   the heirs were allowed to recover for themselves, subject to the right of any
   creditor to proceed with the bankruptcy, if he should be entitled to do so.

6. INNOCENT PURCHASER—POSSESSION NOT ACCOMPANYING LEGAL TITLE.
   If the possession of the land is severed from the legal title, the plea of in-
   nocent purchaser cannot be sustained as against the rightful owner.    Where
   one was in possession, under circumstances charging him as trustee for the
   owner, but the legal title was in another holding for the benefit of the trustee,
   and not claiming for himself, *held*, that a mortgagee from the holder of the
   legal title to secure a loan to the trustee was not protected by his plea of in-
   nocent purchaser.

The ancestor of the plaintiffs was the owner of a large amount of
real estate, estimated by the proof to be worth from $75,000 to $100,-
000.    On May 14, 1869, he executed to the ancestor of defendants
the following contract :

"EXHIBIT A TO ANSWER.

"This agreement, made this fourteenth day of May, 1869, by and between A. M. Ferguson, of the first part, and H. G. Dent, of the second part, all of the city of Memphis and state of Tennessee, witnesseth, that the said Ferguson, for the purposes and considerations hereinafter set forth, has this day bargained and sold to the said Dent all his right, title, and interest of, in, and to certain lots or parcels of land, situated, lying, and being in the city of Memphis and state of Tennessee, as per schedule thereof hereto annexed, and, for identification, signed by the parties hereto. That for said considerations he binds himself to make conveyance by quitclaim to said Dent, or to whomsoever he may direct, of said several pieces of property, on demand, excepting, however, one piece of property contained in the schedule hereto annexed, situated on the south-east corner of Beale and Hernando streets, to which he agrees to make a warranty deed to James E. Dillard, to whom said Dent has bargained the same for $8,000, subject to certain judgment liens, which will be expressed on the face of said deed when it shall be executed. The consideration of this agreement is that the property hereby agreed to be conveyed is much incumbered by judgments, decrees, and deeds of trust, taxes, and assessments for grading and paving, to nearly, if not quite, its full value, as also shown in said schedule, and the only interest remaining to said Ferguson in the same is his equity of redemption. For this equity he is willing to take the sum of $10,000, and allow the purchaser to make the best use he can of the property in paying off said incumbrances and making what he can out of the surplus. The further consideration of this agreement is, therefore, that the said H. G. Dent will pay the said A. M. Ferguson the sum of $4,000 in cash in hand, and, by the conveyance to be made to James E. Dillard, will secure the payment of the further sum of $6,000 to said Ferguson, making an aggregate of $10,000, as agreed upon, and will dispose of the balance of said property to the best advantage to discharge the liens thereon, or otherwise discharge the same, and will have no recourse on said Ferguson in law or equity for any incumbrance or defect of title whatsoever on any of said pieces or parcels of land, but take the same at his own risk; and, inasmuch as the terms, conditions, and considerations of this agreement cannot be properly expressed in the several conveyances desired and contemplated by the parties, this instrument, and the schedule hereto annexed, are made for a more thorough and complete explanation and exposition of the same.

"In testimony whereof, the said A. M. Ferguson and H. G. Dent have hereunto set their hands the day and date first above written.

"A. M. FERGUSON. [Seal.]
"H. G. DENT. [Seal.]

"Attest: W. L. VAN DYKE.
   "C. W. FRAZER."

"DESCRIPTION OF THE PROPERTY AND THE INCUMBRANCES THEREON.

"Part lot No. 1, block No. 46, beginning at a point on the south side of Beale street, 110 feet east from Hernando street, running thence eastwardly 166 feet, by a depth of 125 feet, to an alley.

*"Incumbrances on the Above-described Lot.*

"Trust deed, executed January 30, 1868, recorded in book No. 64, pages 406, 407, 408. H. G. Dent and A. M. Ferguson to John M. Carmack, trustee, part of lot No. 1, block No. (46) forty-six, beginning at a point on the south side of Beale street, 142 feet west of De Soto street, running thence westwardly 150 feet, by a depth of 125 feet, to an alley. Trust made to secure the payment of $18,750 to Cochran & Co., Pettus & Co., Leonard Schoolfield & Co., and others.

"Trust deed, executed April 25, 1868, recorded in book No. 68, pages 355

and 356. A. M. Ferguson to W. H. Ennis, trustee, part of lot No. 1, block No. 46, beginning at a point on the south side of Beale street, 110 feet east from Hernando street, running thence eastwardly 40 feet, by a depth of 125 feet, to an alley. Trust made to secure the payment of $2,111.75 to one Thomas Ford.

"Judgment in the circuit court of Shelby county, *E. McDavitt et al.* v. *A. M. Ferguson et al.*, rendered against defendants, June 13, 1860, for $300.75, and April 2, 1861, for $413.14, and costs; levied on and sold on the twenty-seventh day of April, 1869, part of lot No. 1, block 46, beginning at a stake on the south line of Beale street, 150 feet east from Hernando street, thence east with the south line of Beale street 126 feet, by a depth of 125 feet, to an alley.

"*Henry Laird* v. *R. B. Miller, Joseph Pimn, and A. M. Ferguson,* judgment of condemnation, June 29, 1868, for $492.31, and costs; levied on and sold on the eighteenth day of September, 1868.

"Part of lot No. 1, in block 46, beginning at a point on the south side of Beale street, 110 feet east from Hernando street, running thence eastwardly 40 feet, by a depth of 125 feet, to an alley; part of lot 1, in block 46, beginning at the intersection of Hernando street with the south side of Beale street, running thence eastwardly 70 feet, by a depth of 65.

### "*Incumbrances on the Above-described Lot.*

"Judgment in the law court of Memphis, *Thomas B. Wilkerson* v. *R. B. Miller, Joseph Pimn, and A. M. Ferguson,* rendered against defendants, October 20, 1868, for $519.50 and costs; levied on.

"Part of lot No. 1, block No. 46, beginning at a point on the south side of Beale street, 60 feet east from Hernando street, running thence eastwardly 10 feet, by a depth of 125 feet. Part of lot 1, in block 46, beginning at a point on the east side of De Soto street, 135 feet south from Beale street, running thence southwardly 107 feet, by a depth 209 feet.

### "*Incumbrance on the Above-described Lot.* ·

"Trust deed, executed March 11, 1862, recorded in book No. 53, part first, pages 488, 489, and 490. A. M. Ferguson to Samuel Coward, trustee, part of lot No. 1, block 46, beginning at a point on the west side of De Soto street, 135 feet south from Beale street, running thence southwardly 107 feet, by a depth of 209 feet. Trust made to secure payment of $3,000 to one William Coward. Trust deed executed February 22, 1868, recorded in book No. 64, pages 473 and 474. A. M. Ferguson to Eugene Mageveny, trustee.

"Part of lot No. 1, block 46, beginning at a point on the west side of De Soto street, 135 feet south from Beale street, running thence southwardly 30 feet, by a depth of 150 feet. Trust made to secure the payment of $1,600 to one Patrick O'Toole.

"Trust deed, executed August 10, 1868, recorded in book No. 67, pages 562 and 563. A. M. Ferguson to W. L. Van Dyke, trustee, part lot No. 1, block 46, beginning at a point on the west side of De Soto street, 135 feet south from Beale street, running thence southwardly 107 feet, by a depth of 209 feet. Trust made to secure the payment of $1,059.30 to one William Crook.

"Lot No. 2, in block No. 25, beginning at a point on the south side of Beale street, 50 feet east from Shelby street, running thence eastwardly 50 feet, by a depth of 110 feet.·

"*Incumbrances on the Above-described Lot.*

"Judgment in the chancery court of Memphis rendered *vs.* H. G. Dent and A. M. Ferguson, March 19, 1868, for $7,306.62 and costs, levied on and sold on the eighteenth of September, 1868. Lot No. 2, block No. 25, beginning at a point on the south side of Beale street, 50 feet east from Shelby street, running thence eastwardly 50 feet, by a depth of 100 feet.

"Part of lot No. 3, block 25, beginning at a point on the south side of Beale street, 100 feet east from Shelby street, running thence eastwardly 34 feet, by a depth of 120 feet.

"W. B. Greenlaw & Bro. retain lien on part of lot No. 3, block 25, for $3,400 purchase money, which is still unpaid, together with the interest thereon.

"Part of lot 2, in block No. 51, beginning at a point on the east side of De Soto street, adjoining the south line of engine-house lot, running thence southwardly 10 feet, by a depth of 150 feet.

"Part of lot 2, block No. 51, beginning at a point 150 feet from the east side of De Soto street, and at the north-east corner of the engine-house lot, running thence eastwardly 98 feet, by a depth of 104 feet, on a parallel line with De Soto street.

"Part of lot No. 3, in block No. 51, beginning at a point 150 feet from the east side of De Soto street, and at the south line of lot No. 2, running thence southwardly 60 feet, by a depth of 150 feet.

"Part of lot No. 3, in block No. 51, beginning at a point 200 feet from the east side of De Soto street, and 60 feet south from the south line of lot No. 2, running thence southwardly 40 feet, by a depth of 100 feet.

"*Incumbrances on the Above-described Lot.*

"Trust deed, executed February 24, 1869, recorded in book No. 70, pages 434 and 435. A. M. Ferguson to W. D. Beard, part of lot, in block No. 62, beginning at a point 120 feet from the east side of De Soto street, and on the south line of an alley, running thence eastwardly 28 feet, by a depth of 160 feet. Trust made to secure the payment of $660.25 to one Eliza S. Valentine.

| | |
|---|---:|
| State and county tax, - - - - - | $1,350 00 |
| City tax. forty-first corporate year, ending January 1, 1869, | 1,352 34 |
| Assessment for Nicholson pavement, - - - | 6,998 04 |

                                   "A. M. FERGUSON,    [Seal.]
                                   "H. G. DENT."       [Seal.]

Subsequently the following papers, relating to the contract, also passed between the parties:

"Whereas, on the fourteenth of May, 1869, H. G. Dent and A. M. Ferguson entered into an agreement of purchase and sale, by which said Dent purchased the equity of said Ferguson in all his real estate in Shelby county for the sum of $10,000, $4,000 of which was to be paid in cash and $6,000 in notes; now, the said Dent, having handed over said notes, but not being able to pay said cash, has this day instructed deeds to be made to W. L. Van Dyke of real estate, and has placed in the hands of said Van Dyke, to be held by said Van Dyke by way of security for the payment of said $4,000,—$2,600 to be paid on or before the first day of November, 1869,—and has authorized the said Van Dyke, in case he does not so pay, to sell said real estate or collateral, or so much thereof as will realize said several sums as herein agreed to be paid; and the said Ferguson has this day executed a power of attorney to said Van Dyke, in which he authorizes him to make quitclaim deeds to any of the

property described in said agreement of the fourteenth of May, when called on so to do by said Dent; and has also acknowledged the receipt of said sum of $4,000, which sum has not been paid, and it is understood that the proceeds of any of said property which the said Dent may sell are to be at once paid over to said Van Dyke, as agent of said Ferguson, until the said sum of $4,000 shall have been fully paid up, when the said Dent is to have all of said Ferguson's interest in said property, and in no case is the said Van Dyke to make deeds as authorized, unless, as before stated, for the benefit of said Ferguson, until said $4,000 shall have been paid; the said sum to be paid, with interest at the rate of 6 per cent. per annum.   Upon the payment of said $10,000 it is understood and agreed that the same shall be a full and final settlement of all the matters of account and debt, of whatsoever character or date, existing between said Dent and Ferguson.

"Since the foregoing was written, the said Dent has paid said Ferguson the sum of $1,400 on said debt, the receipt of which is here acknowledged by said Ferguson.                                          A. M. FERGUSON.

"*August* 23, 1869.                                          H. G. DENT.

"Attest:   C. W. FRAZER.

"W. L. VAN DYKE.

"Since the foregoing agreement was signed, it has been agreed that said Dent shall execute his promissory note of this date for the said sum of $2,600, payable to the order of said Dent on the first of November, 1869, and indorsed by said Dent in blank; and it is agreed that the holder of said notes shall have the same rights under said agreement as said Ferguson, and the conditions as to sales and payments, and that said Van Dyke shall regard his wishes in the premises.

"*August* 24, 1869.                                          H. G. DENT.

"Whereas, on the fourteenth day of May, 1869, A. M. Ferguson and H. G. Dent entered into articles of agreement of purchase and sale, by which said Dent purchased the equitable interest of said Ferguson in certain property in the city of Memphis and state of Tennessee, as described in schedule annexed to articles of agreement above referred to, and said Dent not being able to pay all the cash as per terms of agreement, afterwards, to-wit, on the twenty-third day of August, 1869, said parties made another agreement in writing, by which said Dent agreed to and did deposit with W. L. Van Dyke the title to two pieces of real estate, situated in the county of Shelby and state of Tennessee, one lot on Elliott street, in block No. 16, in Butler's subdivision, and parts of lots Nos. 9 and 10, Borland's subdivision, to be held by him as collateral to secure the payment of a certain note mentioned in said last agreement, dated August 23, 1869, signed by said Dent, and made payable to his order, and by him indorsed for the sum of $2,600, due and payable on the — day of November, 1869; and whereas, on the — day of January, 1870, at the request of the undersigned, the said W. L. Van Dyke made and executed a warranty deed to one Ralph Hicks to the lot on Elliot street, in which he acknowledged the receipt of $2,000:   This is therefore to certify that said W. L. Van Dyke did not receive the $2,000 above referred to in cash, but instead thereof received the transfer and assignment of two certain notes, dated Memphis, July 23, 1859, signed by Orville R. Early and Martha J. Early, payable to order of J. F. Hicks for the sum of $750 each; the first one payable twelve months after date, the other one payable twenty-four months after date.   Said notes were given for the purchase of the following-described lots of land, situated in the city of Memphis and state of Tennessee, being lot No. 3, in block No. 9, in the Butler division of the city of Memphis, and a vendor's lien retained on said lot to secure the payment of the above-described notes, and on the twenty-ninth day of October, 1860, a bill was filed in the chancery court of Memphis by *James Franklin Hicks and his wife,*

*Sarah C. Hicks,* v. *Orville R. Early and wife, Martha J. Early,* to enforce said lien, and the cause is still pending in said court. The above-described notes and vendor's lien are to be held by said W. L. Van Dyke in lieu of the aforementioned collateral security.

"In testimony whereof, I have hereunto set my hand and seal this twenty-eighth day of June, 1870.                                    H. G. DENT. [Seal.]

"Attest: F. L. SIMS.

          "J. D. WOODARD."

The plaintiffs averred in their bill that this contract was never intended to be a real sale of the property, but was only a contrivance to deceive the creditors of both Ferguson and Dent, and protect it from their clutches; that the first of the above documents was in possession of one Van Dyke, a partner of Dent's, to be used for that purpose, if required; and that the others were in Ferguson's possession for the same purpose; or else that the first paper was held by Van Dyke as *an escrow,* to be delivered only on compliance with the terms of sale; that when Van Dyke died Dent fraudulently represented to a woman in charge of his effects that he was, as surviving partner, entitled to his papers, and thus procured possession of this contract and other papers belonging to Ferguson; that, subsequently, when Ferguson died, by like fraudulent representations as to requiring some lumber bills, he procured from colored women, in charge of Ferguson's house, the other documents above mentioned, and additional papers belonging to Ferguson, and that he then set up a claim to the ownership of the property under this contract. The bill further averred that Dent was, and had been for a great many years, the agent of Ferguson in the management of this property, and possessed an undue and controlling influence over him, by which he imposed upon him to sell his property for a grossly inadequate price that had never been paid. The answer denied these allegations, including the agency, and claimed title under the above contract, setting out at length the hopeless condition of Ferguson's affairs and the fairness and justice of this contract as between them, and showing how Dent had protected and saved the property from the creditors. It also set up the acquiescence of Ferguson and the lapse of time before his death as a defense, and that Ferguson had filed his petition in bankruptcy, stating under oath that he did not own any real estate, and relied on that proceeding as an estoppel and as showing an outstanding title in another than the plaintiffs. Frazer claimed to hold the property in his name only for Dent's benefit, except that he was to have it as security for his fees and advances to Dent. He had been the attorney of Dent and Ferguson in the transactions mentioned in the bill.

The Building & Loan Association loaned money to Frazer, taking a mortgage; but the loan was really for the benefit of Dent, who was in actual possession of the premises at the time, claiming them as his own as between him and Frazer. Trezevant claimed to hold under Dillard by deed absolute, but intended to be only a mortgage

to secure his advances and fees. Dillard held under a deed and other claims of title, but solely for the benefit of Dent, who was thus concealing the property in the name of others. There were certain parcels of the property not included in the contract above mentioned, the title to which was held in the name of Buchanan and others, for Dent, and which passed out of Ferguson by a decree of sale under the Miffleton bill, filed by a creditor to uncover this property, and subject it to his judgment. After decree there was an assignment of the debt to one Walker, for Dent, and then a sale under the decree to Buchanan for Dent, at nominal sums aggregating $44.

The Logwood transaction was a sale by Logwood & Co. of a stock of dry goods to Dent for $60,000, in part payment for which Dent executed his notes amounting to $50,000, on which Ferguson became his indorser. Creditors of Logwood & Co., and of the firm from which Logwood & Co. had purchased these goods, attacked the sale to Dent as fraudulent, attaching both the goods and the notes. Replevy bonds were executed for the goods by Dent, Ferguson becoming his surety on some of the bonds, and signing the others as principal, he being sued as a partner of Dent. The goods were managed and sold by Dent. He and Ferguson executed a mortgage on most of this property and on one lot belonging to Dent, (not a part of the Ferguson property,) to secure $18,750 to Carmack, trustee for certain of the attaching creditors above mentioned,—an amount agreed to be paid in compromise of their claims. Various parties, mostly Dent's relatives, or those having an understanding with him, purchased under this trust, but Dent became the owner by purchase from them. Ferguson died in 1880, Dent in 1881, and this bill was filed December 10, 1881. The other facts are sufficiently stated in the opinion. The case was heard by the circuit justice, the district judge sitting with him. The record was ordered to be printed, and contains, with the briefs, about 1,000 pages of printed matter, but the opinion can be understood with the above statement of facts.

*T. B. Edgington,* (*Ferguson & Ferguson* with him,) for complainants.

*C. W. Frazer, G. G. Dent, Poston & Poston,* and *H. T. Ellett,* for defendants.

*L. W. Finlay,* for defendant Frazer.

*Clapp & Beard,* for defendant B. & L. Association.

*Wright & Folkes,* for defendant Trezevant.

MATTHEWS, Justice. In this case I am of opinion, after much careful consideration, that the equity of the case is with the complainants, and that they are entitled to a decree as prayed for, against all the defendants. The defense rests entirely upon the agreement and conveyance of May 14, 1869, between A. M. Ferguson and H. G. Dent, Exhibit A to the answer. In reference to that I assume that the execution and delivery are sufficiently proven. I also assume that the agreement was *bona fide* as respects third persons, cred-

itors of Ferguson, nothing to the contrary being set up as a defense in the pleadings.   I find, however, that at and previous to the time of its execution the relation between Ferguson and Dent was of a confidential and fiduciary character, such as to require in such a transaction between them the utmost fairness and good faith, and to forbid Dent's acquiring the title to Ferguson's property except upon terms of a full and adequate consideration, actually paid or perfectly secured. I also find that the transaction in question lacks these essential qualifications to support it.   It is unnecessary for me to rehearse in detail the circumstances clearly proven or admitted which require this conclusion.   This has been done in the views prepared by Judge HAMMOND, which I have examined and scrutinized, and which I agree with and adopt.

I do not think there is ground for contending that complainants are deprived of their right to relief by laches or lapse of time.   I think, on the contrary, they have shown due diligence in the prosecution of their claims.   Neither do I attach any importance to the defense of an estoppel, supposed to arise upon the proceedings in bankruptcy on the part of Ferguson.   It is not an estoppel, for it lacks mutuality. It is at most but an admission of the validity of the agreement of May 14, 1869, and of no avail to counteract the inference which the law itself draws from the circumstances of its execution.   There will be, accordingly, a decree for the complainants, as directed by the district judge, including an order allowing, in the costs to be taxed, the amount of compensation prayed for by the master.

---

MEMORANDUM OF JUDGE HAMMOND'S VIEWS SUBMITTED TO MR. JUSTICE MATTHEWS AT HIS REQUEST.

### Dealing at Arm's Length.

Taking the most favorable view possible for the defendants, and their earliest theory to be true, that "these were all legitimate business transactions, both parties treating with each other at arm's length," (Record, p. 19,) and it is doubtful if a court of equity would not rescind, on the combined grounds upon which the case of *Eyre* v. *Potter*, 15 How. 42, and *Allore* v. *Jewell*, 94 U. S. 506, were respectively decided, the one in favor of the contract and the other against it.   That "unconscionableness or inadequacy which demonstrates some gross imposition or some undue influence, and which shocks the conscience, and amounts in itself to conclusive and decisive evidence of fraud," adverted to by the court in the former case, and which under the circumstances it did not find to exist there, is abundantly proven here.   And that mental weakness, not amounting to absolute disqualification to make a contract, but arising from age, sickness, or any other cause,—in this case from the harassment of debts, and an oppressive use of them for selfish purposes by the grantee,—which renders a person easily influenced by others to enter, without independent advice, into unfair contracts, and which induced the court in the latter case to set aside a contract for an inadequate consideration, is substantially proven here.

The very suggestions of fact and argument addressed, through the answers, proof, and briefs of counsel, to us, in support of the contract, were largely presented to Ferguson to induce him to make it.   But they are so entirely

fallacious, extravagant, and selfish, so entirely without any adequate benefit to Ferguson for the surrender of his property to Dent, that it is inconceivable how any sane man could accept them; and that he did, is of itself conclusive evidence of weakness of mind and gross imposition, or some undue influence, even if these were not otherwise established by the proof. Those suggestions proceed upon the intolerably self-complacent assumption that it was better for Ferguson that Dent should take his property without paying anything of comparative value for it than that it should go to pay Ferguson's debts, and that it is more fair and just that Dent should have the benefit of his shrewd, cunning, and superb management of the property than that Ferguson should have that benefit upon payment of a fair and reasonable compensation for his services.

I am now speaking of the transaction without reference to any fiduciary or other relation between the parties, but as made "at arm's length," one man with another. Dent says to Ferguson: "You have," we will say, "without regard to precision of fact, "one hundred thousand dollars' worth of property, and owe two hundred thousand dollars of debts, which will sweep it out of existence. You cannot extricate it; I can. I am not willing to do this for the ordinary compensation of an agent, however ample that may be, but will give you ten thousand dollars cash, (or its equivalent,) take the property, assume the debts, and rely on whatever I can make, by settling with creditors, for my compensation." To that Ferguson agrees. Now this is the fairest possible statement of the defendants' case, as they would present it; and if Dent had done this,—viz., had appropriated the property to the payment of Ferguson's debts, or had paid them from other means, to such an extent that the amount paid creditors, added to the amount paid Ferguson, constituted a fair price for the property,—there could have been no possible objection to the transaction. And, in determining what was a fair price, the court would not be very particular to scrutinize the amount of profit by limiting it to ordinary, though abundantly ample, compensation, as upon a *quantum meruit* for the work done, but would allow a large margin in the way of speculative profit. But if he succeeded in so manipulating the business as to defeat the creditors altogether, they getting nothing, and he $100,000 worth of property for $10,000, would any court of equity sustain the contract on a bill to rescind it? Or would the case be much better if he succeeded in discharging the debts for, let us say, to be liberal in the estimate, $15,000, so that he got the property for $25,-000? I think not. The inadequacy would be so shocking that the court would say there was some imposition or undue influence; some concealment of hopes, expectations, or facts; some coercion of alarming threats or extravagant prophesy of exaggerated danger impending, sufficient to influence a presumably weak mind, and it would look to the proof for some indication of these things in the facts of the case. Nor would they be wanting here. Dent had been an agent in control of Ferguson's business, although not such (on the theory we are now considering) at the time of the contract. Ferguson was a man somewhat advanced in years, of lower social position than Dent, living and dying in a somewhat degraded life,—"among niggers," as one of the defendants' counsel expressed it at the bar; a man of little education; away from his kindred; and, so far as this record shows, associating mostly with persons incapable of advising, or, like Van Dyke and Gale and Smith and others, connected with Dent in some capacity. Dent had been connected with him from early youth, possessing his confidence, and for some reason Ferguson had found it necessary to employ him as his agent and manager in full control of his business, manifestly Dent's superiority in management being the main cause; and there was constantly before him the harassing scourge of vexatious indebtedness to insolvency. These undisputed facts, and many others that might be included in the enumeration, go further to establish undue influence, or imposition and weakness of mind, as facts,

aside from any inference of the law from inadequacy itself, than the opinions of any number of witnesses *pro* and *con* as to their existence, with which this record is so unnecessarily burdened.

That the danger from the debts was exaggerated is plain, for the exaggeration is kept up in this record and in the arguments of counsel, and constitutes the only defense in this case against the averment of inadequacy of price. And the fallacy of the position is in assuming that the sole test of the danger from the debts is a relative comparison of their aggregate with the value of the property. As between Ferguson and Dent, on the issues of this case now being examined, that is not the only test, but is really a somewhat subordinate element in determining the extent of the danger from the debts. When the purpose is to save the property from the creditors, no matter how large the debts, or what may be the value of the property, the real danger to be considered was the likelihood of the creditors finding the property; and the probability of escaping them altogether was an essential consideration for the parties. Up to May 14, 1869, Ferguson and Dent, or one of them,—no doubt mainly Dent,—had so successfully and skillfully deluded and eluded the creditors that there was no actual appropriation of any of the property to the satisfaction of debts, in the sense that the creditors had realized anything, and it was substantially intact in the hands of Ferguson.

It is true that there had been some small levies,—like those of Fitzgerald, Wilkerson, Hardin, and Stapleton, some of which were settled, or in process of settlement, and all of which were open to redemption,—and the Mifileton bill had been filed; but these were all so insignificant in amount in comparison with the value of Ferguson's property that the liens were not very serious, as one year's rent, or a little more, would, under proper management, have paid the whole of them. It is also true that the Claflin, Miller, Selby, and Apperson bills had been filed, and were proceeding, but were not in judgment; the Carmack deed of trust had been given; and there were also some other trust deeds for debts which, like the levies, were small compared to the total value of the property, and were therefore not a serious danger. If the property was worth $100,000,—and here it is to be observed that the estimates of values of property in the proof have been generally confined to the property demanded by the bill, and do not include other property as to the value of which there is little or no proof, while in the estimates of debts there are included obligations secured by such other property,—at the date of the contract Ferguson could have paid every incumbrance mentioned in its schedule, including the Carmack deed of trust, and every one of the above levies or judgments, not included in that schedule, in full, and then had left nearly $50,000 worth of property, for the debts do not aggregate more than, say, $55,000.

What danger, then, in these induced him to transfer the property to Dent for $10,000, and why should he prefer that the property should go to Dent than to the creditors? What advantage was there to him in a transaction that deprived him of, say, $45,000, and his creditors of $50,000, or so much as would appear a loss to them, when that amount was reduced by deducting whatever sum they agreed to take as settlement of the claims? The Claflin, Miller, Selby, and Apperson debts would, no doubt, have absorbed the balance above calculated for Ferguson; but the ease with which they were settled under the skillful manipulation of Dent, for insignificant sums, demonstrates how hopeless the situation seemed to the creditors; for the astounding fact in this record is that the creditors did not appropriate all this property to their debts, while in the hands of Ferguson, nor afterwards to Dent's debts while in his hands. That they did not, and were willing to settle for so small figures as they did, shows that they did not know the real facts, and that the concealment was almost perfect. Why did not Ferguson regard it in that light when he was negotiating with Dent for the contract of May 14, 1869?

As long as the situation of concealment which deluded the creditors lasted,

or could be kept up, Ferguson was in no great peril with the property held for his own benefit; and what could have been saved might have been saved for him, and at the worst to him it would only go to creditors, who, no doubt, would have made a better bargain with him than Dent did, and would very gladly have taken the property and left him more than $10,000. They did make better bargains with Dent himself, and he could just as well have made them for Ferguson's benefit. But the trouble was Dent would not do this, and the real peril to Ferguson was in the loss of Dent's bargains, the abandonment of him to his fate, and his capacity to injure Ferguson by putting the creditors upon his track through a discovery of the real facts to them; or, if not actually thus aiding them, by leaving Ferguson to struggle as best he could with his own hopeless incapacity to manage the business; for he had not the capacity, and the fortune he possessed does not show to the contrary, for it was the product, not of his own skill in business, but of the natural increase in the value of real estate, purchased at an early day, in what afterwards became the heart of a growing city. This peril, no doubt, induced Ferguson to make the contract he did, but it is very certain that a court of equity would treat it as an imposition and an undue influence upon him, even when the parties are dealing "at arm's length." Moreover, this is not all, nor the true situation, still viewing the parties in the ordinary relation of buyer and seller, under no obligation to deal conscientiously with each other. Dent was himself insolvent, and without means to pay an indebtedness quite as large as Ferguson's, and the property was as much in peril in his hands as Ferguson's. He gave Ferguson no security whatever for the performance of his agreement. His assumption of the debts did not amount to anything, for outside of this very property purchased by him he is not shown to have had any means to make such assumption by him of any value. He did not even secure the $10,000, and it has never been paid to this day. Ferguson acknowledges the payment of $1,400, but he had previously acknowledged the payment of the $4,000 cash when it had never been paid. The weight of the evidence, however, is that the $1,400 was received; but this is all he is satisfactorily proven ever to have received. The $2,600 secured by deposit of deeds with Van Dyke turned out to be no security, for it was exchanged for worthless notes on Early, collectible only by lawsuit, to enforce a lien, which was lost; and when the trade with Hicks for the Early notes was rescinded the land passed back into the Dents through a brother of Henry G Dent, to whom they had been assigned for an indebtedness, which is asserted, but not proven in its particulars; and this is done and sought to be sustained upon the strength of a *pro confesso* by Ferguson in a bill asserting that the $2,600 due him had been paid.

This is not satisfactory proof under the circumstances of this case, showing that Dent used and claimed, and now claims, under the contract, the right to use Ferguson's name in all lawsuits and other matters necessary to carry out the purposes of that contract. Besides, he was there sued only as administrator, and the parties are not the same (Thomas H. Dent being plaintiff in that case) as here, and, technically, the *pro confesso* does not bind plaintiffs in this suit, as it would not have bound Ferguson. The $6,000 notes of Dillard were in no way secured. Dillard's name added nothing to Dent's obligation, and neither was of any pecuniary value. The provision that Ferguson would not make deeds until the contract was complied with by Dent was, as a security, of no value; it could not displace the liens of creditors already attached, nor any to be subsequently acquired, and, as against Ferguson's creditors, would have been of no avail. Besides, a subsequent agreement permitted Van Dyke to make the deeds, and there seems to be no reason for this, unless he would be more compliant to Dent than Ferguson, which the record shows from their relation to have been altogether probable, or unless Ferguson was so incapable of managing his affairs that he must have Van Dyke do it for him. If this be so, it is a fact to show how easily he was

liable to imposition and undue influence. Moreover, the instruments containing the contract and the pretended security not being registered, it is possible that the property became subject to the superadded peril of being liable for Dent's debts as well as Ferguson's. Against these perils Ferguson had no security for the $10,000, certainly none passing from Dent, and his only chance to get that was to save it from the creditors out of the very property conveyed, just as Dent was to save what he could out of the same property for himself. What consideration, then, did Dent pay for Ferguson's property? Absolutely nothing, for he had no other security than the property itself, which was in peril, and this trade added to the peril and nothing to the security. It is manifest that, while in form a contract for the sale of property, it was really a gift of it to Dent, on a promise to save $10,000 out of it for Ferguson, if the creditors could be circumvented, and no security for the promise except a reliance on the ability of Dent to circumvent the creditors. No man but a lunatic, an idiot, or one in the toils of a stronger man would make such a contract, and a court of equity cannot tolerate it, as the cases already cited show, and they could be multiplied in abundance.

The real contract was one to defraud the creditors of Ferguson and Dent out of this property, and it was calculated that this could be done on a basis of $10,000 to Ferguson, to be realized out of the property itself, and all the balance to Dent, whatever that might be. But this was an unequal, unconscionable, and unfair division, particularly in view of actual results, in the accomplishment of which Dent has risked nothing but his time and labor. Ferguson has agreed to give too much for Dent's services in that behalf, and it is a gratuitous assumption of the answer "that plaintiff cannot reap the benefit of any fraud on the part of Ferguson with his creditors," and that "he got $10,000 in good notes and money for his interest in the property involved." The answer says: "He not only concealed this consideration, but aided Dent to conceal his; in other words, good faith was kept between them throughout, and not the best of faith by either with their creditors." Record, 119.

One of the objects of the bill is to prevent the defendants from reaping the lion's share of the benefits of this confessed fraud, and the maxim, *in pari delicto potior est conditio defendentis,* so much invoked by the pleadings, and in argument of counsel, has no application whatever to a case like this. The supreme court has settled that in *Brooks* v. *Martin,* 2 Wall. 70, where a partnership was made to cheat the soldiers of the Mexican war out of their treasury scrip and bounty lands; and the court set aside an unconscionable sale, for an inadequate price, by one of the partners to the other of his share of the illegal profits. The principle is that where the fraud is executed, and is of a kind that reaches only individuals, and does not involve public policy, the courts will compel the guilty parties to divide the fruits of the fraud fairly. It is frequently applied. *Planters' Bank* v. *Union Bank,* 16 Wall. 483, 500. And see, also, cases cited *arguendo* in *Brooks* v. *Martin, supra; Pfeuffer* v. *Maltby,* 54 Tex. 454; *Hall* v. *Richardson,* 22 Hun. N. Y. 444.

## Principal and Agent.

I have thus far considered the case on defendant's theory, that on May 14, 1869, the date of the contract Exhibit A, there was no fiduciary relation between the parties. It is not material here to consider whether Dent was afterwards agent for Ferguson or held the property as his own. The point of inquiry is the date of the contract and anterior thereto. Did Dent at that time hold, or had he recently before held, such fiduciary relation to Ferguson as to bring him within the familiar principle that one so situated must, in order to sustain any dealings about the subject-matter of the confidence, show the utmost good faith and a fair and adequate consideration for the contract? The fact that he did occupy such a relation admits of no argument on this record.

He had acquired such full management and control of Ferguson's property and business that he was substantially its master. The very fact that he exercised such full control shows that Ferguson could not have managed without such an agent, and demonstrates some infirmity or incapacity that made the agency necessary. It is the very case for the highest good faith and self-restraint from all temptation to make profit out of speculations with the principal. It is difficult to conceive a state of facts where the power and influence of the agent were greater than Dent had over Ferguson and his property, and on this subject the record speaks plainly enough to discredit as boldness any denial of the fact. And what has been already said shows that if the contract cannot be sustained as between men occupying no fiduciary relation, *a fortiori*, it cannot be under the stricter requirements which the law makes of one who holds such a relation of confidence as the proof shows Dent held towards Ferguson and this property at the time that contract was made.

Not only did he occupy this relation of trust towards Ferguson and the property he bought, but, as to most of the indebtedness so extravagantly paraded as a sufficient embarrassment of Ferguson to make the contract a fair bargain, he either held the absolute relation of principal debtor, in which Ferguson was only his surety, or else was so connected with the making of the debt as bound him, in all fairness, to do the utmost in his power, without compensation, to relieve Ferguson against it.

My analysis of the indebtedness mentioned in the schedule to Exhibit A, conceding that the whole of it affects the property claimed by the bill,—though it does not,—shows this state of facts: Total indebtedness, $49,379.92. Of this the Nicholson pavement assessment of $6,998.04 was not an incumbrance or a debt due by Ferguson, and, not having been paid by Dent, it should be deducted in considering the question of adequacy or inadequacy. If anybody was bound to know that the law would so declare, it was Dent, as well as Ferguson, for he was "full agent" in the management of this property. As between them, it should be deducted, which would make the entire indebtedness the sum of - - - - - $42,321 88

From this should be deducted the Carmack
  debt, in which Dent was principal debtor,
  and Ferguson his surety, (as will be shown
  *infra*,) - - - - - $18,750 00
And the Jones decree against Ferguson as
  Dent's surety on notes given by the latter for
  land purchased by him at chancery sale, - 7,306 52
                                                    ———————— 26,056 52

    Balance, - - - - $16,265 36

This balance represents the total of Ferguson's own indebtedness, disconnected from Dent, and the full extent of his embarrassments, as shown by the incumbrances of the schedule to Exhibit A, upon which the defendants can rely with any show of justice in determining the fairness of the bargain made on May 14, 1869. Going outside the schedule we find the following incumbrances on the property involved in it, in addition to those enumerated therein:

The Stapleton judgment in the United States court on a com-
  promise note for - - - - - - $ 862 83
And the Hardin judgment, aggregating some - 2,100 00
And the lien of the Miffleton bill, with costs, - - 409 35

                                                    $3,372 18

The two former of these were Dent's own debts, for which Ferguson was surety; the latter was Ferguson's individual debt, which, added to the above

balance of $16,265.36, increases his indebtedness to $16,674.71. This, of course, does not include the Claflin, Selby, Miller, or Apperson debts, which will be hereafter treated with the Carmack indebtedness.

It is, however, necessary to somewhat further analyze Ferguson's indebtedness in its relation to the several pieces of property included in Exhibit A,—both those involved in the bill and those not so involved,—and to examine the proof with reference to their respective values. Counsel have strangely neglected to prove these values with any satisfaction, or how the various debts and incumbrances have been disposed of. Both sides seem to have abandoned some of the property to strangers to this record, and to have assumed that proof concerning it was immaterial, but which is important in the view we take of the case. There is, however, enough testimony to enable us reasonably to infer from it sufficient facts to dispose of the case. And, first, we will consider the values: Royster & Co., real-estate agents, estimate its rental value at $590 per month at the time they certified it; Morrison fixes it at $400 to $450 per month when he collected rents, in the life-time of Ferguson and Dent, and Wheatley, the receiver, by actual results, finds the rental value to be $240 a month. The two former include the Coward property in their estimates; it is not in the bill, and is not, therefore, included by Wheatley. None of them take into account the Greenlaw or ice-house property on Beale street, near Shelby. Hines, a partner of Dent's in the real-estate business at an early day, roughly estimates the property, in 1869, at $100,000. Ford, who owns land in the same locality, values it, unimproved, at $100 per front foot on Beale street in 1869. Parker, a real-estate dealer, without claiming to be accurate, puts it at $75,000 in 1869, and the defendant George G. Dent estimates the property involved in the bill at $29,500 at the time he testified.

Mr. Wheatley's testimony is more satisfactory than any of the others because given more in detail, but he is so loosely examined that there are some very important omissions. Analyzing his testimony, it gives the following as the value of the property scheduled in Exhibit A, though not all involved in the bill, viz.:

| | |
|---|---:|
| Frontage on Beale street, without improvements, 236 feet at $100, | $23,600 |
| Ferguson Hall improvements, valued at | 8,000 |
| Improvements on McWilliams' lot, valued at | 3,500 |
| Improvements on Barbour lot, valued at | 3,000 |
| Coward lot, without improvements, valued at | 8,560 |
| Hell's Half Acre, without improvements, valued at | 1,400 |
| Greenlaw lot, without improvements, valued at | 6,720 |
| Ten feet next to engine-house on De Soto street, valued at | 400 |
| Improvements on Hell's Half Acre and Shirt-tail Bend, valued at | 3,000 |
| | $58,180 |

(By a typographical error this last is printed in the record $13,000.)

The above does not include the value of the improvements on the Coward property, which the other proof shows to have been considerable, or on the Greenlaw and Jobe lots, as to which there is no testimony, nor does it include the land in Shirt-tail bend, except the ten feet leading to it from De Soto street.

All the witnesses are misled by the fallacious assumption of examining counsel that the incumbrances on the property affect its value, and it is a fallacy running all through this case. What is important to know in an inquiry like this is the actual money value of the property, and then the character and extent of the incumbrances, from which inferences of fact develop themselves; or, if necessary, they may be supplemented by opinions of wit-

nesses. Unsatisfactory as it is, we think it a fair inference, from all the proof, that the property in Exhibit A was worth, May 14, 1869, not less than $75,000. If, therefore, Dent had paid all Ferguson's own debts, dollar for dollar, and the cash payment stipulated in Exhibit A, the question of adequacy or inadequacy would stand thus:

Total value of property, - - - - - - $75,000
Deduct Ferguson's debts, $16,674, and said cash payment,
$10,000, - - - - - - - 26,674

Leaves as Dent's profit, the sum of - - - $48,326

Or, taking Wheatley's estimate of $58,180, with all its omissions, as the true value, and the profit made would only be reduced to $31,506. Neither of these results will stand the test of that good faith in dealing, and that fair price which every agent must prove he has paid to his principal when he buys property from him. But when it is considered that the $10,000 was not paid, or secured to be paid, according to the contract,—and ability or willingness to *now* pay is wholly immaterial to this inquiry,—and that the incumbrances were not paid or secured to be paid by Dent in any other way than by the appropriation of the property itself to their payment, the case *does not stand even that well for the agent who desired to speculate with his principal's property* in the business of defeating the creditors of both,—"the strict morality of which respondents say they are advised is not here involved," (Record, p. 119,) which, if true, estops the defendants from relying upon any immorality in it, by invoking the defense of *in pari delicto*.

But let us examine further these incumbrances of Ferguson's own debts, amounting to said sum of - - $16,674 71
Which includes the Coward debt, amounting to $3,000 00
The O'Toole debt, (No. 2,) amounting to - 1,600 00
The Crook indebtedness, amounting to - - 1,059 30
And the debt due Greenlaw, amounting to 3,400 00 9,059 30

Which leaves Ferguson's debts on property sued for at $ 7,615 41

There should also be, of course, a corresponding reduction of the value of the property scheduled in Exhibit A, by deducting therefrom the value of the realty therein not claimed by the bill, and incumbered by the four debts just enumerated. 

Taking Wheatley's estimate as above, - - $58,180 00
Deduct the property on Beale St., near Shelby, - $6,720
And the Coward lot on De Soto St., (107 ft.,) - 8,560 15,280 00

Leaves the value of the property claimed by bill, - - $42,900 00
From which take the incumbrances of Ferguson's
debts on it, - - - - - - 7,615 41

It leaves, as Dent's profit in the transaction, - - $35,284 59
Or assuming that he paid the $10,000 according to
contract, the profit would be - - - - $25,284 59

The bill charges that the four debts last named were paid by Ferguson before May 14, 1869, or subsequently, out of the rents and profits. The answers say nothing of the O'Toole $1,600 debt, and deny all knowledge of the Crook debt. There is no proof as to the payment of any of them, except that the Coward lot has been subjected by bill in chancery to the payment of the incumbrances upon it, by which it passed to Coward, was abandoned by defendants, and is not claimed in this suit. The burden being upon defendants to

show Dent's utmost good faith in dealing with his principal, and that a fair and reasonable price was paid by him for the property, it cannot, on this record, be assumed that he has paid any of these four debts, the first three of which were incumbrances upon the Coward lot, and the last upon the Greenlaw lot.

There is in the record a suggestion of suspicion that there should be some further elimination in the Ford transaction, (about which there is some confusion of boundaries and a too meager explanation that the trust deed was "closed out,") if the precise facts were known; and also as to the Miller & Pimm judgment incumbrances; for, in Frazer's agreement with Ferguson (Record, p. 675) it is mentioned that Ferguson has paid certain Miller & Pimm security debts, and the fact is that the Miller & Pimm property, which Ferguson held as security, passed first into Frazer and then into Dent; at least, they now enjoy the property. But while the burden is upon the defendants to show fairness, and in the absence of proof all intendments of the law are conclusive against an agent dealing with his principal, these last items have not been eliminated in arriving at the inadequacy just shown. Nor are the O'Toole lot (50x125 feet) at the corner of Beale and DeSoto streets, and the lot (60x60 feet) on Hernando street in the rear and south of Ferguson hall included in the foregoing calculations, because, though demanded by the bill, they are not included in Exhibit A.

But inasmuch as there was no reasonable or adequate security passing from Dent to Ferguson for the payment either of the $10,000 or the incumbrances, and as it was a speculation pure and simple in the property itself and in Dent's ability to save it from creditors, we should test this question of adequacy by actual results rather than by unperformed and unsecured promises of advantage.

| | | |
|---|---|---|
| The amount of profit as shown above made by Dent is | $33,884 | 59 |
| ($35,284.59 less the $1,400 actually paid Ferguson.) | | |
| To which must be added the profit of Miffleton bill, - | 299 | 35 |
| ($409.35 less the $110.00 actually paid.) | | |
| And the state and county taxes not paid in the sum of - | 1,350 | 00 |
| Together with the city taxes for the forty-first corporate year, | 1,352 | 34 |
| Which swells his profit to the sum of - - | $36,886 | 28 |

The lien of the Miffleton bill not having been scheduled in Exhibit A, and the taxes not having been paid by Dent, as we know, since they are now being paid by the receiver,—though one of the defendants testifies that some taxes were paid, but the amounts are not shown nor are the receipts produced, —the foregoing additions are made. This calculation is reached by crediting Dent with the payment of the Ford debt, which the defendants have not shown he paid. It appears in proof that the west three feet of the McWilliams lot were conveyed to Ford, and that between this narrow strip and his 40-foot lot is one of 16 feet front. I infer that Ford's debt was really paid by conveying to him the 19 feet east of his 40-foot lot. Ford says he paid the Laird and McDavitt incumbrances, and the above result is reached by allowing them as paid by Dent. The Ford, McDavitt, and Laird debts, all amounting to $3,317.95, were, therefore, at most, all of Ferguson's debts that incumbered the 166x125 feet on Beale street, which Dent could have paid under the proof in this record, and leaves only the Carmack incumbrance upon it.

The only incumbrance upon the Ferguson Hall lot was the levy upon the east 10 feet of it of the Wilkerson judgment for $519.50, in which Ferguson was surety; and while it is allowed Dent in the above amount, the probabilities are that Ferguson paid it in the transaction with Frazer concerning the Miller & Pimm securities. The Hell's Half Acre lot was incumbered by the Vollintine debt of $660.27, which the bill says Ferguson paid. The answer

denies all knowledge of this, and as there is no proof, it is allowed above as though paid by Dent. The Coward and Greenlaw lots we have eliminated, and the "Shirt-tail Bend" property was unincumbered.

But let us look at this transaction in yet another view of the question of inadequacy. It being, though in form otherwise, a mere contract for speculation in a scheme to so manage Ferguson's property as to save it for both in fair proportions, according to the contribution of each, let us try it by the actual fruits of the venture, but under the law governing the dealings of an agent with his principal. Ferguson, as shown, put into the enterprise his property, worth, at the lowest estimate, over $58,180, and agreed, as the defendants say in their answers, to do everything he could t) further the object in view by allowing the use of his name in all necessary lawsuits, by the making of deeds, etc., and faithfully kept the contract. Dent put in, so far as we can see, only his services and skill in the business, and the success achieved shows that these were valuable. Now, Dent paid in the prosecution of the business the following sums, discarding all considerations growing out of the fact that the bulk of the debts were his own, in which he had involved Ferguson as his surety:

| | |
|---|---:|
| To Claflin, as defendants assert, but do not prove, - - (And the real amount is otherwise proven to be but $1,000.) | $ 2,000 00 |
| To Selby, $500, and to Selby's lawyers, $825, making in all - | 1,325 00 |
| It does not appear how the Pitser Miller claim was settled, though it was transferred to Fletcher, the surety on the replevin bond, and by him to Dent. By assuming it was settled in the same proportion as the others, the amount would be - - - - - - - - - | 1,500 00 |
| To Apperson, on his claim, the sum of - - - | 500 00 |
| To the claimants on the Carmack trust debts, in all, - - | 7,100 00 |
| To Stapleton, (Ferguson being Dent's surety in this,) | 862 83 |
| To Hardin, (Ferguson being Dent's surety in this.) - | 2,100 00 |
| To Miffleton, through Walker, the sum of - - | 110 00 |
| To which add Ferguson's own debts, except taxes on the property demanded by the bill and in Exhibit A: the Ford debt, $2,111.75; McDavitt judgments, $300.75 and $413.14; the Laird judgment, $492.31; Wilkerson debt, $519.50; and Vollentine, $660.27, - - - - | 4,497 72 |
| Making a grand total of - - - - - | $19,995 55 |

And here it is to be remarked that Dent, the principal, while under a plain obligation, not only as principal, but also by the contract, Exhibit A, to protect Ferguson, his surety, against these debts, secured his own release from Apperson by coercing Ferguson, through importunity, at least, to consent to Dent's release without releasing himself. Nothing in this record shows more plainly how much Ferguson was under the domination of Dent, and how utterly unable he was to take care of himself, as against Dent, than this undisputed transaction about the Apperson release. It is worth more as evidence than the opinions of all the witnesses in the record.

| | |
|---|---:|
| Taking now the above estimated value of such of the property in Exhibit A as is claimed by the bill, or - - | $42,900 00 |
| And deducting the above sum as paid, or - - - | 19,995 55 |
| And we have a balance of - - - - | $22,904 45 |

—As the balance of Ferguson's interest when freed from all incumbrances (except unpaid taxes) on the property, May 14, 1869, in Exhibit A, now claimed

by the bill, and this sum represents the profits of the enterprise on this theory, and is certainly the most favorable calculation possible for the defendants on the subject of inadequacy. How would a court of equity divide this sum between these joint adventurers in the speculation of circumventing, not to say defrauding, the creditors who have been the victims, and for his part of which Dent's counsel apologised by saying that he did not wish to pay for the Logwood goods twice, when in fact he has not nearly paid for them even once, and altogether, on our too liberal estimate in his favor, only $12,425, and all this with Ferguson's property, except the $2,500 realized out of the Botanico-Medical College lot? But, passing all other considerations, how, as between principal and agent dealing thus, would the court apportion this profit of $22,-904.45? Certainly, Ferguson should have been paid one-half to make it anything like a full and fair deal between them, but we find him taking only $10,000 in unsecured, unperformed, and to this day violated promises, on which nothing has been realized except a paltry $1,400. This is not such a contract as an agent may make with his principal; and a court of equity cannot sustain it. To execute it now, if we would, by paying Ferguson the balance and interest after his share, which in all justice should have been paid promptly according to the contract, has been so unjustly withheld all these years, leaving the entire property in the enjoyment of Dent, would be inequitable. But that is not the question. Was it a fair advantage for the agent to take of his principal in a trade with him? I say not; and when it is considered that this agent took advantage of the power and influence he had over this evidently inferior man to involve him in the wild and disastrous speculation of the Logwood transaction (when he should have advised him against it and protected him from it) by inducing him to become his own accommodation surety for an amount nearly the value of his whole estate,— for this was originally his only attitude,—it is, to say the least of it, the boldest demand that was ever made in a court of equity, to ask it to consider the Claflin, Selby, Miller, Apperson, and Carmack debts (either as originally made or as closed out) as an element of calculation in determining the fairness of this division of the profits. The Hardin and Stapleton debts stand on no better footing, and the inadequacy of the division Dent induced Ferguson to make becomes appalling to a court of conscience when we strike these out of this calculation, and show that Ferguson sold his real interest, worth $42,-900, less incumbrances of $4,613.72, or the sum of $38,286.28, for $1,400 cash, and unsecured and yet unexecuted promises to pay $8,600 additional.

We deem it necessary, however, to treat somewhat more fully the alleged partnership relation between these parties, as the greatest inadequacy we have shown has been in large part reached by discarding the debts arising out of the partnership. The facts are that at the time of the Logwood purchase Ferguson was only a surety on the "Dent & Co." notes and on the Claflin replevy bond. Subsequently he appears as principal on the Miller and Selby replevy bonds, and his attitude does not clearly appear in the Apperson suit, though he seems to have been sued jointly with the other defendants, as a partner, perhaps. Logwood denies in his answer to the Pitser Miller bill that Ferguson was a partner of H. G. Dent & Co., and says he had no connection with the trade except as indorser of the notes. Dent also denies it in his answer, and says Ferguson "has an interest in said house, but that same was acquired long after the said purchase, to-wit, July 1, 1867." Ferguson says that "about July 1, 1867, at the instance of H. G. Dent, he went into the firm and became an equal partner with said Dent therein, hoping to realize something therefrom." Here it is to be noted that, as Dent was manager of Ferguson's business and especially of his litigation, the latter's statements should not be taken too strongly against him, as it was probably more the language of Dent than of Ferguson. Besides, it is a familiar principle that courts, in receiving admissions by pleading, regard the fact that they are couched in the language

of the attorney rather than of the client. Dent does not say Ferguson was a partner, but that "he acquired an interest in said house." Moreover, all the defendants in that case, including Dent, distinctly say: "The purchase was not made with a view of going into and continuing the business of a merchant, but that the same was made by him for the purpose of jobbing said goods off and trading them with other property, the one proving an inducement for the other." Again, Dent says: "This respondent admits that his co-defendant Ferguson is not a merchant, nor did he intend to become one by taking an interest in said goods, but relies upon this respondent for the management and disposition of the same."

Counsel on neither side have undertaken to prove specifically what this contract about the goods between Dent and Ferguson was, and we have no accurate knowledge about it; and, notwithstanding the broad language of Ferguson's answer above quoted, that of Dent implies, under the circumstances, not so much a contract of partnership as one for joint interest in the goods, which may be an entirely different thing. But if they were merchants regularly in business, which is carefully denied, it is a merely gratuitous assumption, in the absence of specific proof, to say that by becoming a partner Ferguson assumed any liability for the previously existing debts of the firm of "H. G. Dent & Co.," even as between the creditors and himself. It was not necessarily so, and in the absence of proof cannot be assumed; and yet that assumption is the main reliance of the defense here in seeking to charge Ferguson as a principal debtor with Dent on these claims, in determining the fairness of their bargain. When the Carmack notes for $18,500 were given, Ferguson indorsed them as before, and did not become a joint maker, which is another circumstance against the notion of a partnership. Moreover, whatever Ferguson's technical relation to the creditors may have been, as between Dent and Ferguson, on the issues of this case, the former can have no sort of advantage of such relation. The case must be governed by his own attitude towards Ferguson and his own relations to that transaction. Now, by his own confession that Ferguson relied on him for the management and disposition of the goods, Dent brings himself again within the relation of agent to his principal; and it was so decided in *Brooks* v. *Martin*, 2 Wall. 70, for such was precisely the attitude of the partners in that case and the *gravamen* of the decision. In the first place, therefore, as the general agent and manager of all Ferguson's business, Dent was guilty of a gross breach of trust in selfishly involving his principal in such a disastrous liability as he assumed by indorsing the former's notes and becoming a surety upon the Claflin replevy bond in the ruinous Logwood speculation. In the next place, it was his highest duty, as Ferguson's agent generally, and as the manager of the Logwood goods, to apply them when attached, speedily and entirely to the exoneration of Ferguson; but there is no proof that he did anything of this kind, and the Arkansas lands inferentially supposed to have been purchased with their proceeds, and which belonged to the so-called partners, in some unexplained way passed, like almost everything Ferguson seemed to have owned, into Dent's sole ownership without being used to pay any of these debts.

Both these breaches of trust enter as a potential element into an inquiry as to the fairness of the contract between this agent and his principal, which we are asked to sustain. And, in themselves, the transactions out of which these debts arose show conclusively how completely Ferguson was in the power of Dent, and how readily he could be unduly influenced by him. If Dent could prevail upon Ferguson to do such things, there is no wonder that he could induce him to make the bargain of May 14, 1869.

These so-called partnership debts, I think, should be wholly discarded in this consideration, and the fundamental fallacy of the defense lies in treating them otherwise; or, if not wholly eliminated, they can only serve to show, under the circumstances of their creation, the weakness of Ferguson's mind, his

inability to take care of himself in matters of business, and the legal impossibility of an agent like Dent dealing with him for any advantage of his own, be it great or small. No bargain such a dominating agent could make with so feeble a principal would stand in a court of equity without its being shown beyond all peradventure that it was beneficial to the principal, not only in the nature of the bargain itself, but also in its actual results. These debts certainly cannot be used to magnify Dent's part in the transaction, or dignify his attitude towards it.

The fatal mistake that Dent made, and that counsel here perpetuate, is that, in determining the fairness of Dent's bargain, the evasion of the debts, in whole or in part, so that Ferguson was released from them, is equivalent to payment of them by him in full. He can only be allowed for what he paid; otherwise Ferguson receives no benefit and no consideration for his property. Except to the extent of the actual payments by Dent either to Ferguson or his creditors, and a reasonable compensation to him, there could be no consideration for sale by Ferguson of his property.

Unless there be some other available defense, it is impossible to sustain the fairness of this bargain of May 14, 1869. We refer again to the case of *Brooks* v. *Martin, supra,* to say that in all respects it is in principle a complete precedent for our judgment on this branch of the case, and on its authority alone we must pronounce it. We have only carefully applied the principles and reasoning of that case to this.

### Statute of Limitations and Acquiescence.

It is hardly necessary to say that this defense cannot be available. Under more favorable circumstances it did not prevail in *Allore* v. *Jewell,* 94 U. S. 506. Ferguson was in the toils of Dent. He had no capacity to manage his affairs; certainly none to war against Dent. He did not know enough about his business to understand his rights, and no wonder, for its complications are difficult to unravel even now by counsel and the court, with the aid of this immense record. It does not lie in the mouth of Dent, or those who come after him, to complain that his schemes to cover up this property from creditors and all the world, and appropriate it to himself, were not sooner challenged by a man in Ferguson's situation. His heirs have proceeded as promptly as they could. Dent kept the books, if any were kept, and the evidences of his transactions as agent, and it is his fault if there be any want of proof in this case on behalf of his heirs; it certainly is not Ferguson's

### Ferguson's Bankruptcy.

Without undertaking to decide the issue tendered by the plaintiffs, that Ferguson's bankruptcy was instigated and procured by Dent for the very purposes for which it is now used, as a shield against any possible attack upon his operations, we can have no difficulty in holding that it cannot avail the defendants here. The estoppel, by his oath, so much relied on, does not apply to the circumstances of this case, as we understand the law. *Behr* v. *Insurance Co.* 2 Flippin, 692; Broom, Leg. Max. 168. It appears plainly enough from this record that Ferguson did not know the true condition of his affairs, and Dent, being his agent, did know it. He was familiar with Ferguson's property, knew it was liable for his debts, and knew of the bankruptcy, and it does not belong to him to stand by and see Ferguson get into that predicament by his oath, and then rely upon it as a defense. If the bankruptcy is to have any effect, it is not in favor of the defendants, but of Ferguson's creditors. The act itself requires the bankrupt to hold the property in trust, and protect it until it can be delivered to an assignee, and if the bankrupt dies before an assignee is appointed the trust passes to his heirs. The plaintiffs here, then, could recover it for the assignee when appointed.

We do not think the case has been discontinued by the abandonment of

Ferguson or the action of the register in returning it marked "discontinued." This could only be done by the formal action of the court. The creditors, never having been notified, cannot be said to have abandoned their interest in the proceeding, and it cannot be discontinued by the bankrupt without notifying them, as they have the right to prosecute it. But, in looking over these bankrupt schedules, there do not appear to be any creditors except those as to whom some suggestion of a settlement of their claims appears in this record through the transactions we have been scrutinizing, and one or two comparatively small claims reaching back to 1861–1865, and presumably barred by statute before the bankruptcy commenced. The others are too insignificant to notice. We have therefore concluded to treat the bankruptcy proceeding as worthless for any purpose in this case, and leave the creditors who are in a condition to prosecute to whatever remedy they may have after the property has been recovered.

### Other Property not in Exhibit A.

What we have called the O'Toole lot, (60x125 feet,) at the corner of Beale and De Soto streets, and the small lot (60x60 feet) on Hernando street, south and in the rear of Ferguson Hall, are not included in Exhibit A, and must be separately considered. As to the latter the record is obscure, and there is some confusion in its description and boundaries, and it is sometimes treated as a part of the Ferguson Hall lot. The claim of the defendants to both these lots must, in its ultimate analysis, rest on the lien of and the decree of sale under the Miffleton bill, which was filed to collect a judgment of about $400 against Ferguson. Its lien, under our law, attached to all the property described in it, and included not only these two lots, but all the property in Exhibit A, and much else besides; the object being to reach all Ferguson's realty in Shelby county. The bill was filed March 29, 1869, about 40 days before Exhibit A was executed, and no doubt alarmed Ferguson and Dent, as it was calculated to disclose to the creditors everything which was concealed. It went to a decree, and all Ferguson's interest in the whole property, including these two lots, was sold to satisfy that small debt. Although the answers were somewhat promptly filed, there was no decree of sale until February 15, 1871, and here the matter rested till March 14, 1873, when the attorney for the plaintiff entered into a contract to transfer the decree to one J. M. Walker for $25 in cash and $125 to be paid in 90 days. Walker in this matter was acting for Dent. On this contract there was paid in small sums $110. Afterwards, on May 3, 1873, the order of sale was renewed, presumably by Dent, who in the name of Walker had become the assignee.

On May 31, 1873, there was a sale of Ferguson's interest in all the property described in the bill, and it was bid off by H. Buchanan, a young man working for Dent, a connection of his, and, like Walker, one of his instrumentalities, for the following sums: All of lot 1, block 46, including these two lots, for $10, and the other property described in that bill for $34. On March 9, 1874, the bid on lot 1, block 46, was assigned to Thomas Buchanan, a brother of the other, and an instrumentality of Dent's; title was vested in him March 31, 1874. All this was done for the benefit of Dent. In 1866 Ferguson gave a deed of trust on the (60x125 feet) lot at the corner of Beale and De Soto to secure O'Toole a debt of some $3,255.12, and the same year Fitzgerald levied an execution upon that and the (60x60 feet) lot on Hernando street, both of which were sold to the execution plaintiff for $693, and were conveyed to him in 1868 by the sheriff. Soon afterwards Dent redeemed from Fitzgerald, in the name of Dillard, another family connection, and an instrumentality of his in these transactions. Under the O'Toole trust deed the beneficiary became the purchaser at the sale, and went into possession subject to redemption under our laws. Dent, in the name of Buchanan, afterwards filed a bill against Mrs. O'Toole for redemption. The case went to

the supreme court and resulted in charging her with the rents during her possession and applying them to the redemption of the lot from her sale. In this proceeding the plaintiff relied upon Ferguson's title as being superior to that of Dillard, (who was shown to have no title, and only holding for Dent,) claimed under the Miffleton decree, and had the title vested in him, Dillard's being set aside. This Dillard had become involved as a surety on McLean's bond as tax collector, and was otherwise bankrupt, and no longer a safe depositary or stake-holder for Dent, and therefore the above process was resorted to to get the property out of him, as was the bill filed against the sheriff to enjoin a levy of the McLean execution on these two lots as Dillard's property, the title standing in his name. From all this it is plain, in view of the relations existing between Dent and Ferguson, that the agent was guilty of a breach of trust in thus, through the Fitzgerald execution and the O'Toole redemption, possessing himself of his principal's property for an inadequate price, and under circumstances that show its unfairness.

### Purchase of the Selby Decree.

The same considerations must prevail to avoid the pretended purchase by Susan R., a sister of Henry G. Dent, of the Selby decree, and her claim to it. It needs no argument to show, on the facts, that Dent was merely acting in her name in the transaction, one circumstance being conclusive. She did not pay the lawyers, who were paid by Dent's widow out of the College lot, nor does she show any payment of her own money to Selby. Like Dillard, Walker, the Buchanans, and the rest, she was only an instrumentality of Dent in these transactions.

### The $4,500 Note.

The defendants produce a note of $4,500 made by Ferguson, payable to Dent's order, dated March 9, 1873, and due three years after date, with 6 per cent. interest. They know nothing about this note except that they found it among Dent's papers after his death, but assume that it is still a subsisting liability, and seek a twofold use of it: *First*, as a fact tending to show that Ferguson would not have given it had Dent at that time owed him anything, and his acquiescence in and satisfaction with the bargain they had made; *second*, as a set-off. The plaintiffs urge that its real date was 1863, and that Dent having procured it with other papers taken from Van Dyke's papers after his death, or from Ferguson's room after his decease, the defendants have sought to make a fraudulent use of it by changing the date to 1873. This contention is based alone upon the appearance of the paper. It is on a printed form containing the figures 186-, for the year of the date after which is written the figure 3, and upon the printed 6 is written the figure 7. The note has on the back the signature of H. G. Dent in the usual form of a blank indorsement, and there is written over the signature these words: "June 8, 1876, credit, by cash, $123."

The plaintiffs insist that this figure "7" is of different ink from the "3," which appears dim and rubbed or abraded, while the "7" is fresher, heavier, and in a different hand, and that the credit indorsed shows a more recent writing than its pretended date. We are not satisfied that the figure "7" is in different ink from the "3," notwithstanding the difference in appearance, but there is undoubtedly a great difference between the age of Dent's signature and the indorsed credit. It was evidently simply indorsed in blank at first and this credit afterwards written above the signature, but whether of a later date than it purports we cannot say, though it has a suspicious appearance of more recent writing. We deem this quite immaterial. Upon the undisputed facts of this case the defendants cannot rely upon the bare possession of this note as evidence that it is unpaid, or remains, or ever was, the representative of a liability from Ferguson to Dent as between themselves. In the first place, whether Dent ever got Exhibit A and the two im-

v.24f,no.8—28

portant exhibits to Smith's deposition from Sallie Horn after Van Dyke's death or not, and whether he got them from among Ferguson's papers after his death or not, and whether he was technically Ferguson's agent and the custodian of his papers after 1869 or not, there is no kind of doubt that Van Dyke was in possession of papers belonging to Ferguson up to his death, and that Dent's relation of partner to Van Dyke was used to induce Sallie Horn to deliver to him some papers after Van Dyke died, nor that he visited Ferguson's home after his death and got other papers from those belonging to Ferguson, and inspected all there were in the place where he kept them.

These circumstances are sufficient to impose upon the defendants the burden of proving something more than the bare fact that they found this note among Dent's papers, before they can use it against Ferguson or the plaintiffs. Moreover, while there is a good deal asserted about mutual indorsements by Dent and Ferguson for each other, no proof is made that Dent ever indorsed for Ferguson, nor ever had any credit to make such accommodation valuable, and no doubt, as appears from this record, neither of them used bankable paper in that way, and not a single transaction through a bank is proven. But it is shown that in the Hardin matter Dent held a note of Ferguson for $1,500, executed purely for his accommodation, and that two years after it became due he transferred it to Hardin for $600, according to his story, pledging it as collateral security for a loan of that amount, at the usurious rate of 2 per cent. interest a month, and, according to Hardin's version, selling it outright. They had a lawsuit about it, one of Dent's creditors (plainly at his instigation) filing a bill against Hardin to recover the usury. A judgment was obtained by collusion with Dent, under which Ferguson's property was levied on and sold to Hardin and afterwards redeemed by the Trezevant-Dillard transaction, as before shown. Again, Ferguson, after the Exhibit A transaction, executed, without any pretense of consideration, four notes to Jobe, Dent's brother-in-law, for $400 each, on which Ferguson was immediately sued and submitted to judgment, and the judgments were used by Dent to transfer Ferguson's property to himself. This is a most remarkable transaction, which defendants do not seek to explain, and only apologize for by saying, in the briefs of their counsel, that Ferguson had agreed to aid Dent in "working out the purchase," and to extend him every facility, and that, being already hopelessly insolvent, these judgments could not hurt him and he could not have expected to pay the notes; and yet they were used, in connection with other transactions, to transfer to Dent the O'Toole lot and the Chelsea property, not conveyed by Exhibit A, and as to which Ferguson was under no such obligation as counsel indicate, in regard to the other property in Exhibit A, and Dent used these Jobe judgments to pick up such of Ferguson's property as was not included in that exhibit. Ferguson's reckless compliance in this, and many other quite as remarkable transactions, shows clearly that after the bargain of May 14, 1869, he continued so completely under the dominion of Dent, and was so incapable of taking care of himself, that no transaction between them can be supported upon the mere technicalities of its appearance. Defendants cannot be allowed to rely on the bare possession of this $4,500 note.

### Frazer's Cross-Bill

Frazer's cross-bill to collect attorney's fees against Dent for services in these numerous lawsuits, upon the theory that he holds the legal title to the property in his name as a surety, cannot be sustained. He does not technically plead innocent purchaser, and it is apparent that his relations to these transactions are such that he could not sustain such a plea. The claim that he has an equity as against the property for protecting it, by his professional services, from Ferguson's creditors and Dent's, cannot avail him in this action. He has no contract for a lien except with Dent, (and for which he has

no judgment or decree,) and Dent had no title. Besides, his services were for the benefit of Dent as against Ferguson, and did the latter no good.

### Trezevant's Cross-Bill.

The same may be said of Trezevant's cross-bill for his fee in the Dillard transaction, for which he holds a deed from Dillard as a mortgage. He does not remember the deed he wrote for Ferguson to sign, but which he did not execute. Nevertheless, the existence of the deed in his handwriting, as well as other circumstances not necessary to mention, conclusively fix him with notice, even if he had a technical plea of innocent purchaser, which he has not.

### Building and Loan Association Cross-Bill.

This association is in no better attitude than Frazer. It does not sustain its plea of innocent purchaser. Frazer was not in possession, and Dent was as trustee for Ferguson in reality. Lemmon says that Dent was in possession while he and Barbour held, and afterwards continued when the legal title was put in Frazer. The loan was really made in the name of Frazer for Dent, the former being only the go-between. The association should not have relied alone upon the paper title, but gone further and found whether Frazer had actual or constructive possession. Dent did not have the legal title, but only a contract with Ferguson, which was executory; and Ferguson's equity is prior to that of any purchaser from Dent, either directly or through Frazer, who held confessedly for him. *Boone* v. *Chiles,* 10 Pet. 177. This severance of the legal title and pretended ownership, as evidenced by the possession of the claimant of that ownership, was a suspicious circumstance to invite inquiry and inspection of Dent's title, whereupon its true character would have been developed by a knowledge of the facts upon which it must depend. The trust deed must be canceled, and the sale made under it since this suit was begun set aside, the association having been the purchaser at the sale.

### The Proof.

As will be observed, these conclusions have been reached almost exclusively upon the documentary evidence, and such facts in the testimony as cannot reasonably be disputed. It has not been found necessary to consider whether the evidence establishes the plaintiffs' theory, that the exhibits upon which defendants rely were never, in fact, executed by delivery; or, if they were, whether the whole was not a mere contrivance between Ferguson and Dent to protect the former's property from creditors, in the belief of which, and of Dent's good faith, Ferguson lived and died. This latter theory would reasonably account for many remarkable transactions in this marvelous record, which otherwise would place Dent in the attitude of deceiving Ferguson, as well as the creditors, with a scheme of selfish aggrandizement unparalleled in the history of judicial investigation, if the plaintiffs' view of this case be correct. But our judgment is placed on the defendants' own theory, and we find that, on the facts as they present them, not, however, as they look at them, the bargain they set up, and the transactions they rely upon, are unfair and unconscionable, as between persons occupying the relations that had existed between Ferguson and Dent, at and prior to the time they were made.

### Account.

As remarked by defendant's counsel, since Ferguson's and Dent's administrators are not parties here, a technical account between them as debtor and creditor is impossible. Still, it would be proper to take an account, if necessary, solely to settle the respective equities of the parties; but, following the precedent of *Allore* v. *Jewell,* 94 U. S. 506, we do not think an account necessary. It could only proceed, for the purpose indicated of charging defendants with all the rents and profits from the date of their possession under

their claim of title, to the appointment of a receiver in this case, and crediting them with payments made by Dent, or themselves, to Ferguson, or on his account, and for his benefit. Now, from May 14, 1869, when defendants say Dent went into possession, as of his own right, to the qualification of the receiver, on December 29, 1882, would be 13 years and seven months. Taking the receiver's operations as the basis of rental value,—and it is lower than the other witnesses, and, no doubt, too low for past years, when the property was in better condition,—and the rental value amounts to $2,880 a year, which for the whole time is $39,120. Now, it is manifest that these rents will largely overbalance any credits to defendants, under the most liberal allowance, even counting the payments to Claflin, Miller, Apperson, Carmack, Barbour, Hardin, Stapleton, and all the Ferguson incumbrances in full, for they all, as we have seen, amount to but little over $20,000. There would be, under this most liberal estimate possible, a balance of nearly $20,000 due the plaintiffs. Hence, as indicated by the case last cited, it is useless to take such an account, and we can safely and equitably leave the rents to set off the payments and compensation Dent might fairly claim, and any improvements that have been made by the latter, of which there is no proof; yet we know, from the receiver's reports, there have been none of much, if any, value.

### The Decree.

The decree therefore should be to cancel and vacate all the muniments and claims of title by the defendants, or any of them, of whatever character, and divest the title out of them, and each and every one of them, and vest it in the plaintiffs, free from all demands of any kind by said defendants or any of them. Also to enjoin the defendant Susan R. Dent, now Hooper, and her husband, from prosecuting any claim to the Selby decree mentioned in the bill; and to dismiss the various cross-bills. Also that the receiver pass his accounts before the master to be reported and settled by the court, and that he have judgment against the defendant Sarah L. Dent, and the sureties on her refunding bond, for any sums paid to her by him according to the tenor and effect of said bond, but for the use of the plaintiffs, and that upon the settlement of his accounts the receiver be discharged. Also that he deliver possession to the plaintiffs, for which purpose a writ of possession should issue to place them in the quiet possession of the property, freed from all tenants of the receiver and their effects.

### Costs.

The Building & Loan Association, Frazier, and Trezevant should pay all costs, respectively, accrued at their instance either upon their answers or cross-bills. Out of the funds in the hands of the receiver the officers of the court, including the examiners for taking testimony, should be paid their legal fees, not already paid by the parties themselves, but this should not include any docket or deposition fees taxed to counsel for plaintiffs until the other officers are first paid. The plaintiffs should have judgment against the widow and heirs at law of Henry G. Dent for all costs paid by them directly or through the receiver.

---

NOTE. By direction of the circuit justice the plats, abstracts of title, analysis of debts, incumbrances, etc., table of dates, subject index to the record, etc., prepared by the district judge for the convenient consultation of the record, are filed as part of the opinion, to accompany the transcript of the record in case of an appeal, but it is not deemed necessary to insert them here.—[REP.